UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, United States Department of Labor, | Civil Action No. |
| Plaintiff, | February 27, 2019 |
| v. | |
| TARA CONSTRUCTION, INC.; and PEDRO PIREZ, an individual, | Injunctive Relief Sought |
| | Jury Demand |
| Defendants. | |

## COMPLAINT

Defendants Tara Construction, Inc. ("Tara Construction") and Pedro Pirez violated Section 11(c), 29 U.S.C. § 660(c), of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. (the "Act"), when they unlawfully retaliated against José Martin Paz Flores ("Paz") because Paz engaged in protected activities under the Act.

On March 29, 2017, Paz fell from a ladder and was seriously injured while he was working as a drywall taper for Tara Construction. Paz reported that injury to Tara Construction and his injury caused the Occupational Safety and Health Administration ("OSHA") to make an inquiry into Tara Construction related to Paz's fall. Soon after Paz engaged in those protected activities, Defendant Pirez initiated a law enforcement investigation of Paz and facilitated his arrest. Paz would not have been arrested on May 10, 2017 if he had not reported his injury to Tara Construction and caused the OSHA inquiry to be initiated.

Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor (the "Secretary") specifically alleges as follows:

1

## I. LEGAL FRAMEWORK, JURISDICTION, AND VENUE

1. The Secretary brings this case pursuant to Section 11(c) of the Act, 29 U.S.C. § 660(c). Among other things, Section 11(c)(1) of the Act prohibits the discharge of or discrimination against "any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter." 29 U.S.C. § 660(c)(1).

2. "[S]ection 11(c) of the . . . Act also prohibits [an employer] from discriminating against an employee for reporting a work-related fatality, injury, or illness." 29 C.F.R. § 1904.36; accord id. § 1904.35(b)(1)(iv) (An employer "must not discharge or in any manner discriminate against any employee for reporting a work-related injury or illness.").

3. Section 11(c)(2) of the Act grants the Secretary the authority to bring an action against any person that violates Section 11(c) "in any appropriate United States district court," which "shall have jurisdiction" and the power to "to restrain violations of paragraph (1) of this subsection and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." 29 U.S.C. § 660(c)(2).

4. This court has jurisdiction pursuant to 29 U.S.C. § 660(c)(2) and 28 U.S.C. § 1331.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). Defendants Tara Construction and Pirez reside in Massachusetts. Tara Construction has a regular place of business in Massachusetts, and the events giving rise to the claims in this case occurred in Massachusetts.

## II. THE COMPLAINANT AND DEFENDANTS

6. Complainant Paz was working for Tara Construction as a drywall taper on March 29, 2017, when he fell from a ladder and broke his leg.

7. At the time that Paz fell from the ladder on March 29, 2017, according to Defendant Pirez, Paz was an employee of Tara Construction.

8. At the time of Paz's fall, he was earning $22.00 per hour working for Tara Construction.

9. Tara Construction is a full-service general contractor that was started by Defendant Pirez.

10. At the times material to this case, Defendant Pirez was the Chief Executive Officer of Tara Construction.

11. At all times material to this case, each Defendant was a person as defined by 29 U.S.C. § 652(4).

12. On or about May 18 and/or 19, 2017, a Section 11(c), 29 U.S.C. § 660(c), complaint was filed with OSHA on behalf of Paz.

## III. DEFENDANTS UNLAWFULLY RETALIATED AGAINST PAZ

A. The Secretary's Prima Facie Case

**Paz Engaged in Protected Activities Under the Act**

13. As stated above, on March 29, 2017, Paz fell from a ladder and broke his leg while working for Tara Construction.

14. Paz was taken to the hospital by ambulance.

15. Defendant Pirez visited Paz at the hospital on the day he was injured.

16. During that visit, Paz reported to Defendant Pirez that he had an accident and needed help with his medical expenses.

17. Paz told the medical staff at the hospital that Defendant Pirez was his boss and gave the medical staff permission to share with Defendant Pirez what had happened to Paz; the medical staff told Defendant Pirez that Paz had broken his leg.

18. On the day Paz was injured he also functionally reported his injury to John "Shane" Cronin, the Tara Construction foreman on the worksite where Paz fell from the ladder.

19. Cronin filled out the Employer's First Report of Injury or Fatality related to Paz's fall; that document states that Paz's injury was reported to Cronin.

20. Paz also caused OSHA proceedings into Tara Construction to be instituted.

21. On March 29, 2017, the day of Paz's injury, an employee of the Boston Fire Department referred Paz's fall from the ladder to the OSHA Boston South Area Office.

22. On the same day, OSHA proceeded to initiate an inquiry into Tara Construction with respect to the incident involving Paz.

23. On or about March 29, 2017, OSHA contacted Tara Construction by phone, fax and letter to request a response regarding the incident in which Paz was injured, including requesting that Tara Construction perform an incident investigation. Some of OSHA's communication with Tara Construction on or about that date was directed to Defendant Pirez.

24. OSHA's inquiry into Tara Construction that began on or about March 29, 2017 was caused by Paz's fall from the ladder.

25. On or about May 18, 2017, OSHA opened a formal investigation of Tara Construction that focused, in part, on the incident involving Paz's fall from the ladder.

### Defendants Took Adverse Action Against Paz

26. After Paz reported his injury and OSHA began its inquiry into Tara Construction, Defendant Pirez initiated a law enforcement investigation of Paz and then facilitated Paz's arrest.

27. Defendant Pirez told OSHA that in late March or early April 2017, the hospital called Tara Construction's president, Michael Donnelly, inquiring about a "Jose Paz."

28. Donnelly told OSHA the hospital later called him back asking for "Martin Paz" based on communication that the hospital apparently had with Paz's sister.

29. When the hospital called Donnelly, it was inquiring about workers' compensation issues related to Paz's injury.

30. On or about April 4, 2017, Tara Construction's workers' compensation insurance company denied coverage related to Paz's injury because Tara Construction's policy had been canceled for non-payment of a premium.

31. Defendant Pirez told OSHA he was not concerned about potential liability or costs related to a lack of workers' compensation insurance at the time of Paz's injury.

32. Paz reporting his work-related injury was a substantial factor in bringing about the hospital's communication with Tara Construction.

33. Defendant Pirez knew that there was a Martin Paz that worked for Tara Construction who had in fact been injured and was in the hospital.

34. There is no evidence that any Tara Construction employee other than Paz was injured during the same week that Paz fell from the ladder.

35. Defendant Pirez contacted Boston Police Detective Juan Seoane approximately two to three weeks after Paz's injury, and asked Detective Seoane to look into Paz's identity. As

part of that process, Pirez provided Detective Seoane with certain of Paz's identifying documents.

36. Detective Seoane contacted a Boston Police Department employee who works with Immigration and Customs Enforcement ("ICE"), Sergeant Detective Gregory Gallagher, and provided him with information about Paz.

37. Sergeant Gallagher was on a joint ICE/Boston Police Department task force.

38. Sergeant Gallagher tried to do some research on Paz and also reached out to his contacts at ICE with the information that Detective Seoane had provided to him.

39. To try to locate Paz, Detective Seoane asked Defendant Pirez if Paz was still working at Tara Construction, and Defendant Pirez said no.

40. Detective Seoane also asked Defendant Pirez if Paz would be at the office any time, and Pirez said that Paz would have to come to the office to pick up a check.

41. Detective Seoane then called Sergeant Gallagher to tell him that Paz would be picking up a check at Defendant Pirez's office. Sergeant Gallagher responded, according to Detective Seoane, by stating that he wanted to know when that would happen and further stating "we probably gonna pick him up . . . [t]o find out if that's him or not."

42. Two days before Paz's arrest, Detective Seoane asked Defendant Pirez via text message for the address of the Tara Construction office, and also asked Pirez if it was okay for Detective Seoane to give Sergeant Gallagher Pirez's number so that Sergeant Gallagher and Pirez could communicate directly; Pirez stated via text message that was okay and provided the address of the office.

43. Detective Seoane gave Sergeant Gallagher Defendant Pirez's information and address a few days before Paz was arrested.

44. Sergeant Gallagher contacted Defendant Pirez directly and went to the Tara Construction office to visit him.

45. Defendant Pirez told Sergeant Gallagher that Pirez was going to give Paz some money to help him out.

46. Sergeant Gallagher wanted to know when Paz would be at the Tara Construction office and whether Pirez had any problem if they picked up Paz while he was there.

47. Defendant Pirez told Sergeant Gallagher the date and time that Paz would be at the Tara Construction office and said he had no problem if they picked up Paz while he was there.

48. Paz went to Tara Construction's office on May 10, 2017 to meet with Defendant Pirez.

49. Just after Paz's meeting with Defendant Pirez on May 10, 2017, as the car Paz was riding in drove away from the Tara Construction office, it was stopped by law enforcement and Paz was arrested in the presence of Sergeant Gallagher and ICE.

50. Paz's young son was in the car and witnessed Paz's arrest.

51. The foregoing actions by Defendant Pirez would dissuade a reasonable worker from reporting an injury or causing an OSHA proceeding to be instituted.

**Paz's Protected Activity Caused Defendants to Take Adverse Action Against Him**

52. Based on the closeness in time between Paz's protected activity and the adverse action that Defendants Tara Construction and Pirez took against him, which was approximately two to three weeks, there is sufficient evidence of causation at the prima facie stage.

B.  <u>Defendants' Alleged Rationales for Their Adverse Action Are Pretextual</u>

53. Tara Construction did not provide OSHA with a written position statement in this matter.

54. During his interview, however, Defendant Pirez told OSHA that he contacted Detective Seoane about Paz after he concluded "things didn't add up" because the person named Paz employed by Tara Construction had a different first name than the person about whom the hospital had inquired.

55. Defendant Pirez's rationale for taking adverse action against Paz is pretextual, as shown by the following facts: (a) Defendant Pirez's alleged concern regarding Paz's identity is not plausible; (b) Defendant Pirez's testimony to OSHA that he did not facilitate Paz's arrest is contradicted by the account of a credible witness and documentary evidence; (c) Defendant Pirez is hostile toward workers around issues of workplace safety; and (d) there was a motive for Defendant Pirez to take adverse action against Paz.

**Defendant Pirez's Alleged Concern Regarding Paz's Identity is Not Plausible**

56. Paz has multiple middle and last names.

57. Various government documents set forth Paz's name as "Jose Martin Paz Flores."

58. It is common in Paz's culture and community to have multiple middle or last names. It is also common for people to use a middle name or second name as a first name, like the way that Paz uses the name Martin as a first name.

59. Some people refer to Paz as José and others refer to him as Martin; at Tara Construction, he was known by the name Martin Paz.

60. At Tara Construction, the foreman on the project where Paz was injured, Cronin, is himself known by a name that apparently is not his formal name.

61. Defendant Pirez referred to this foreman as "Shane Cronin."

62. That foreman, however, put the name "John Cronin" on the Employer's First Report of Injury or Fatality related to Paz's injury in this matter. In order to clarify who the person was that filled out this report, Tara Construction's president, Donnelly, stated to OSHA that "[h]is name is John Cronin," and "[w]e all call him Shane."

63. Upon information and belief, there is no evidence that anyone at Tara Construction, including Defendant Pirez, contacted law enforcement with concerns about Cronin's identity or initiated a law enforcement investigation of him because he used a first name that is apparently different from his formal name.

64. Defendant Pirez told OSHA it never crossed his mind that José might be Paz's nickname or another of several names that Paz has.

65. According to Defendant Pirez, he never communicated his alleged concern about Paz's multiple names to Paz himself and never asked anyone else at Tara Construction if Paz went by the name José.

### Defendant Pirez's Testimony to OSHA That He Did Not Facilitate Paz's Arrest Is Contradicted by the Account of a Credible Witness and Documentary Evidence

66. Defendant Pirez testified to OSHA that he did not communicate with any law enforcement officials about when his meeting with Paz would take place and he had no idea how law enforcement knew where Paz would be when Paz was arrested.

67. Defendant Pirez's testimony is contrary to the description of events according to Sergeant Gallagher. Under Sergeant Gallagher's account, law enforcement knew when Paz would be at the Tara Construction office because Defendant Pirez told Sergeant Gallagher the date and time that Paz would be at the office.

68. Further, according to Sergeant Gallagher, he inquired about whether Defendant Pirez had any problem if they picked up Paz while he was at the Tara Construction office to collect money that Pirez was going to give to Paz. Per Sergeant Gallagher's account, Pirez said he had no problem if they picked up Paz while he was at Tara Construction's office.

69. Defendant Pirez's statement that he did not communicate with any law enforcement about when the meeting with Paz would take place at Tara Construction's office also appears to be contradicted by text messages between Detective Seoane and Pirez.

70. In a text message exchange between Detective Seoane and Defendant Pirez, which occurred on Monday, May 8, 2017, just two days before Paz's arrest, Pirez told Detective Seoane something about Wednesday at 1:00 p.m.

71. According to Defendant Pirez's testimony to OSHA, he told Paz to come to his office on Wednesday, May 10, 2017 after 1:00 p.m. to collect some money that Pirez wanted to give to Paz.

72. Thus, upon information and belief, Defendant Pirez was texting with Detective Seoane about the time of his meeting with Paz, which was to occur on May 10, 2017, the day Paz was arrested.

73. In addition, telephone records show that on May 9, 2017 and May 10, 2017, Sergeant Gallagher and Defendant Pirez called each other approximately fourteen times.

74. According to telephone records that the Secretary has obtained, there are no calls between Sergeant Gallagher and Defendant Pirez between May 11, 2017, the day after Paz's arrest, and May 30, 2017.

75. The amount of communication between Sergeant Gallagher and Defendant Pirez on the day of Paz's arrest and the day prior indicates that Pirez was in fact communicating

substantially with Sergeant Gallagher about when the May 10, 2017 meeting with Paz would occur.

76. The foregoing allegations indicate that Defendant Pirez, contrary to his testimony to OSHA, was well aware of how law enforcement knew that Paz would be at the Tara Construction office on May 10, 2017, and that Defendant Pirez facilitated Paz's arrest.

**Defendant Pirez Is Hostile Toward Workers Around Issues of Workplace Safety**

77. With respect to another workplace incident unrelated to this case, Defendant Pirez was mad that a worker should have known better than to walk down an extension ladder like a set of stairs, which resulted in the worker breaking his leg.

78. Defendant Pirez stated with respect to this prior incident: "You can't fix stupid," and "I was so mad that he should have known better."

79. These statements by Defendant Pirez reveal his general hostility toward workers around issues of workplace safety.

**There Was a Motive for Defendant Pirez to Take Adverse Action Against Paz**

80. Paz's fall from the ladder on March 29, 2017 caused OSHA to initiate its inquiry into Tara Construction on or around that date, which included OSHA sending a letter to Defendant Pirez requesting that Tara Construction take various steps, such as the performance of an incident investigation.

81. Pirez was ultimately responsible for safety at Tara Construction.

82. According to Tara Construction's president, Donnelly, there were no witnesses to Paz's fall from the ladder.

83. By facilitating Paz's arrest and detention, Pirez could have impaired Paz's ability to assist OSHA and also to participate in any other investigations related to Paz's injury.

**IV.   PAZ EXPERIENCED EMOTIONAL DISTRESS, PAIN AND SUFFERING, AND FINANCIAL LOSS AS A RESULT OF DEFENDANTS' RETALIATION**

84.   Paz has experienced substantial emotional distress, as well as pain and suffering, as a result of Defendants' actions in this case, including anxiety, lack of sleep, and physical pain while in detention.

85.   Paz breaks down when he tries to talk about the fear and anxiety that has resulted from Defendants' retaliatory actions and their consequences.

86.   Paz has suffered guilt and anxiety because his young son had the traumatic experience of witnessing Paz's arrest from his car seat, and the toddler has increased fear and anxiety following that incident.

87.   Paz has had great difficulty sleeping at night, and he continues to lie awake wondering what will happen to him and his family.

88.   In terms of pain and suffering, while detained, Paz's pain was significantly increased by the fact that at times his hands and feet were shackled, which made it extremely awkward and painful to use his crutches and move his leg.

89.   Paz fell while trying to get up the steps into a transport van while shackled, causing him acute pain.

90.   In addition, after Paz was arrested, he was denied pain medication for several days.

91.   Paz was medically cleared and authorized to work as of February 1, 2018 and actively sought work since that date. He accepted the first job he was offered and began working on or about April 24, 2018.

**V.      PUNITIVE DAMAGES ARE NECESSARY AND APPROPRIATE**

92.     Punitive damages are warranted in light of Defendants' intentional or reckless disregard for the law, i.e., consistently brash conduct as detailed above, and callous indifference to Paz's rights under the Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Secretary prays that this court:

1.     Adjudge that Defendants Tara Construction and Pirez unlawfully took adverse action against Paz because he engaged in activity protected by Section 11(c) of the Act, 29 U.S.C. § 660(c).

2.      Order Defendants Tara Construction and Pirez, as well as their agents, servants, employees and all persons acting or claiming to act on their behalf and interest, to comply with the provisions of Section 11(c) of the Act, 29 U.S.C. § 660(c).

3.     Grant all appropriate relief, including, without limitation:

   a. Require Defendants Tara Construction and Pirez to pay Paz's lost wages, as well as pre- and post-judgment interest thereon;

   b. Require Defendants Tara Construction and Pirez to pay any other damages relating to their actions, to include compensatory and punitive damages;

   c. Require Defendant Tara Construction to provide Paz with a neutral letter of reference;

   d. Require Defendants Tara Construction and Pirez to expunge from their files any statement or information regarding adverse action taken against Paz that relates to the allegations in this Complaint;

   e. Require Defendant Tara Construction to post in a prominent location at Tara Construction, for no less than 120 consecutive days, a notice easily

      seen and readable by employees that Defendant Tara Construction will not in any manner discriminate against employees because of such employees' engagement in activities protected by Section 11(c) of the Act, 29 U.S.C. § 660(c);

f. Require Defendant Tara Construction to disseminate electronically to all current employees at Tara Construction and all employees hired by Tara Construction for two years from the date of any final judgment in this matter a notice of such employees' rights to not be discriminated against for engaging in whistleblowing activity under Section 11(c) of the Act, 29 U.S.C. § 660(c);

g. Require Defendants to pay the costs of this action; and

h. Grant such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Secretary requests a jury trial in this matter on all issues triable by jury.

| | |
|---|---|
| Post Office Address: | Kate S. O'Scannlain<br>Solicitor of Labor |
| U.S. Department of Labor<br>Office of the Solicitor<br>JFK Federal Building<br>Room E-375<br>Boston, MA  02203<br>TEL: (617) 565-2500<br>FAX: (617) 565-2142 | Maia S. Fisher<br>Regional Solicitor<br><br>/s/ Kelly M. Lawson____<br>Kelly M. Lawson<br>Counsel for Civil Rights<br>lawson.kelly@dol.gov |
| Date:   February 27, 2019 | MA BBO No.  650410<br><br>/s/ Mark A. Pedulla____<br>Mark A. Pedulla |

Senior Trial Attorney
pedulla.mark.a@dol.gov
MA BBO No. 685925

Attorneys for Plaintiff

Case 1:19-cv-10369-LTS   Document 1   Filed 02/27/19   Page 15 of 15