UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor,[1] | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | )   Civil Action No. 19-10369-LTS ) |
| TARA CONSTRUCTION, INC., et al., | ) ) ) |
| Defendants. | ) ) ) |

MEMORANDUM AND ORDER ON SECRETARY'S
MOTION FOR SPOLIATION SANCTIONS
[Docket No. 92]

June 7, 2021

Boal, M.J.

In this action, Plaintiff Martin J. Walsh, as U.S. Secretary of Labor (the "Secretary"), accuses defendants Tara Construction, Inc. ("Tara") and Pedro Pirez of unlawfully retaliating against employee Jose Martin Paz Flores after his fall from a ladder led to an inquiry by the Occupational Safety and Health Administration ("OSHA"). The Secretary has moved for sanctions against Defendants for their alleged spoliation of evidence. Docket No. 92.[2] For the following reasons, I deny the motion without prejudice.

---

[1] Martin J. Walsh, who is now the Secretary of Labor, is substituted for former Acting Secretary Al Stewart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

[2] On December 7, 2020, Judge Sorokin referred this case to the undersigned for all purposes, including full pretrial management. Docket No. 59.

1

I.   RELEVANT BACKGROUND

   A.   The Parties' Positions Regarding The Secretary's Claims

The Secretary alleges that the Defendants retaliated against Paz for reporting a March 29, 2017 workplace injury to OSHA by contacting law enforcement to inquire into Paz's identity. Amended Complaint ("AC") at ¶¶ 26, 36.  This inquiry allegedly resulted in the arrest of Paz, facilitated by his employer, in the vicinity of his workplace on May 10, 2017.  Id. at ¶¶ 47, 49.

Defendants, on the other hand, maintain that Pirez contacted Boston Police Detective Juan Seoane[3] to find out Paz's real name after the hospital called inquiring about a Jose Paz when Paz was known to Pirez and Tara Construction employees as Martin Paz.  See generally Docket No. 88 at 9.  According to Defendants, Pirez did not tell Seoane how to find Paz's name or to inquire about his immigration status.  Id.  Seoane, on his own, decided to run certain searches and to contact a colleague, Sgt. Det. Gregory Gallagher, who had been part of a joint ICE/BPD task force for over ten years.  Id. at 9-10.  Based on his investigation, Gallagher determined that Paz had a criminal record, had been previously deported, had no legal status in the United States, and the Alien Resident number that Paz had provided to Tara was false and was actually assigned to a Japanese man.  Id. at 10.  Given this information, immigration authorities made a determination that Paz would be arrested and detained.  Id. at 10-11, 13.

The Defendants deny that they facilitated Paz's arrest.  Rather, they maintain that it was only after Seoane told Pirez that Paz's Resident Alien Card and Social Security Card were false, that Paz had no legal status in the United States, had a criminal record, and had been previously deported, and after authorities determined that they would arrest Paz, that Seoane and Gallagher

---

[3] Seoane is Pirez's wife's cousin.  See Docket No. 93-1 at 5.  Pirez has known him since they were 15 years old and they are close.  See id.

questioned Pirez about Paz's whereabouts and Pirez cooperated with authorities by providing information regarding Paz's expected visit to Tara Construction. Id. at 11-13.

B.  Alleged Spoliation Of Certain Texts By Pirez

On May 22, 2017, OSHA sent Defendants a notice regarding Paz's Section 11(c) Complaint. Docket No. 93 at 3; Docket No. 97-7. That notice, addressed to both Tara and Pirez, advised them of their responsibility to preserve all evidence relating to Paz's complaint, including texts, until the case was concluded or otherwise resolved. Id.

On June 7, 2017, OSHA issued subpoenas for the testimony of Pirez and Michael Donnelly, Tara's President. Docket No. 93 at 4; Docket No. 93-3. It also issued a subpoena for documents directed to the Keeper of Records of Tara. Id. The subpoena to Tara requested, among other things, all communications, including text messages, between Tara or any person acting on its behalf, and law enforcement personnel, including law enforcement personnel acting in an unofficial capacity, for the period March 29, 2017 to May 15, 2017. Id. Defendants' response to that request consisted of a spreadsheet that they apparently compiled based on their records for Tara's company's phones, including Pirez's. Docket No. 93 at 4. The spreadsheets appear to reflect the date, time, and duration of phone calls and the numbers used. Id. They do not reflect the substance of any communications. Id. Defendants have never produced any text messages to the Secretary in response to that request or to discovery requests served in this litigation. Id.[4]

OSHA interviewed Pirez on June 28, 2017. When OSHA asked whether Pirez sent

---

[4] On October 4, 2017, the Massachusetts Attorney General's Office issued a subpoena to Tara and Pirez that requested, inter alia, all communications between Tara and employees of the Boston Police Department concerning Paz. Docket No. 93 at 7. The Defendants told the Attorney General's Office that there were no written communications between Tara and/or its employees with the Boston Police Department. Id.

3

Seoane the cards that Paz submitted with his job application, Pirez said, "I made a copy and gave them to him . . . in person." Docket No. 93-1 at 6. OSHA asked "[w]ere there any text messages exchanged about this with –" and Pirez interjected "I exchanged text messages with him about – with him all the time."[5] Id. Asked whether he exchanged any texts about Paz with Seoane, Pirez replied: "I don't have any messages in my phone. I can't tell you." Id.

Pirez first told OSHA that law enforcement asked him when Paz might be coming into the Tara office and Pirez told them that he might be coming into the office later in the week to pick up a check. See Docket No. 93-1 at 10. Later in the interview, however, Pirez told OSHA that he did not communicate with law enforcement about when Pirez's meeting with Paz at the Tara office would take place and that he had "no idea" how law enforcement knew Paz would be at the Tara office on the day he was arrested. Id. at 10-11. When asked why he thought Paz was detained the same day that Paz traveled to Tara's office to meet with Pirez, Pirez responded: "Why did my insurance company cancel my insurance and Mr. Paz gets hurt on the same day? It's a fluke." Id. at 11. OSHA later asked Pirez whether he discussed Paz with Seoane on May 8, 2017, and Pirez responded, "No sir." Id. After Pirez described giving Paz money on May 10, 2017, OSHA asked "[d]id you have any conversations with anyone from law enforcement prior to Mr. Paz showing up to pick up that check that day?" Id. at 13. Pirez told OSHA that he only found out "that Paz had been arrested in the newspapers." Id.

When the OSHA investigator advised Pirez to keep his cell phone in case they needed to look at it, Pirez interjected that he got a new cell phone two to three weeks ago because he "sat" on his phone. Id. at 6-7.[6]

---

[5] However, Pirez also testified that he did not "know how to text that good . . .", Docket No. 93-1 at 6, and that he is not a "text messager." Id. at 16.

[6] According to records obtained by the Secretary, Pirez in fact had purchased the new cell phone

4

On July 28, 2017, OSHA interviewed Seoane. Docket No. 97-5. When asked about communications with Pirez, Seoane responded "if you have it from Pedro, you have it all." Docket No. 97-5 at 50. When asked if he had text messages he sent to Pirez, the following exchange took place:

| | |
|---|---|
| SEOANE: | Um, I don't think so. |
| MS. ACKERMAN: | It would be on that phone? |
| SEOANE: | Yeah. |
| MS. ACKERMAN: | Do you mind checking? |
| SEOANE: | Um, no. I don't have anything. Only the address that he gave for the office. |
| MS. ACKERMAN: | What's the date on that text? |
| SEOANE: | That date was May 8th. |
| MR. MCGEE: | Okay. |
| MS. ACKERMAN: | Can you say more about that does that text say? |
| SEOANE: | It just says, "Hey, Pedro, what – what's your address for your office," and he told me "28 Don Grail Street (Inaudible) building." |

Docket No. 97-5 at 50-51. OSHA asked whether it could take a picture of the text, which, Seoane permitted. That text shows the following exchange between Seoane and Pirez:

| | |
|---|---|
| PIREZ: | Miercole [sic] a la 1 pm<br>(Wednesday at 1 pm) |
| SEOANE: | En tu oficina, cuál es la dirección<br>(In your office, what is the address) |
| PIREZ: | 28 Damrell street Boston MA 02127<br>Read [sic] of the building |

on June 26, 2017, two days before the interview. See Docket No. 93-8.

> SEOANE: I'm going to give Sgt Gallagher your number if that's ok so you can communicate with him
>
> SEOANE: Direct
>
> PIREZ: Okay

Docket No. 93-11. When asked to confirm that this text was the only text with Pirez on his phone for the period from March 29 to May 30, 2017, Seoane said that he only had texts from May 4 forward. Docket No. 97-5 at 52-53.

The Secretary alleges that Pirez provided information about Paz to Seoane through texts but that those texts have never been produced and have been lost or destroyed. Docket No. 93 at 10-12. The Defendants, on the other hand, have stated that to the best of Pirez's recollection, the only responsive text message lost from his phone is the May 8, 2017 text message reproduced above. Docket No. 93-2 at 3.

II.     ANALYSIS

The Secretary alleges that the Defendants spoliated certain texts between Pirez and Seoane regarding Paz and seek sanctions, including (1) instructing the jury that Defendants destroyed or lost texts and that the jury must (or, in the alternative, may) infer that those texts contained information unfavorable to Defendants; (2) precluding testimony by Defendants that Pirez initially told Seoane only Paz's name and provide Paz's work papers to Seoane only in response to a subsequent request from Seoane; and (3) awarding fees associated with bringing this motion. Docket No. 93 at 2.

    A.     Standard Of Review

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Rivera v. Sam's Club Humacao, 386 F. Supp. 3d 188, 200 (D.P.R. 2018) (citations omitted). To

support an inference of spoliation, "the party urging that spoliation has occurred must show that there is evidence that has been spoiled (i.e., destroyed or not preserved[,]" as well as that " the opposing party had notice of a potential claim and of the relevance to that claim of the destroyed evidence." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir. 2012).

Spoliation of electronically stored information ("ESI") is governed by Rule 37(e) of the Federal Rules of Civil Procedure.[7] Rule 37(e) provides that spoliation occurs where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Thus, a party claiming spoliation of ESI must establish first that ESI has been lost and is not available in any other location. Wai Feng Trading Co. Ltd. v. Quick Fitting, Inc., No. 13-56WES, 2019 WL 118412, at *5 (D.R.I. Jan. 7, 2019) (citations omitted). "Second, the court must consider whether and when a duty to preserve the lost ESI arose; this requires consideration of when the party in possession of the ESI was on notice not only of the litigation but also that the ESI would be relevant to the litigation." Id. (citations omitted).

Further, Rule 37(e) applies only if the party in the possession of the lost ESI failed to take "reasonable steps" to preserve the information and the information could not have been restored or replaced through additional discovery. Id. "In applying the requirement of 'reasonable steps,' courts must be mindful that 'perfection in preserving all relevant electronically stored

---

[7] Prior to the 2015 amendments to the Federal Rules of Civil Procedure, a court could impose sanctions for spoliation of ESI based on its inherent authority. See Boudreau v. Shaw's Supermarkets, Inc., No. 2:17-cv-259-DBH, 2019 WL 3242051, at *1 (D. Me. Jul. 18, 2019). Since 2015, Rule 37(e) "forecloses reliance on inherent authority or state law" to determine when sanctions should be imposed for spoliation of ESI. Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e). However, "[w]hether and when there is a duty to preserve remains a decision based on 'a common-law duty' 'when litigation is reasonably foreseeable,' and the Rule 'does not attempt to create a new duty to preserve.'" Boudreau, 2019 WL 3242051, at *1, n. 4 (quoting Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e)).

information is often impossible,' as well as that this factor requires consideration of the litigation sophistication of the party in possession of the ESI and the proportionality to the litigation of costly and aggressive preservation efforts." Id. (citation omitted).

If the movant establishes that a party failed to take reasonable steps to preserve ESI after a duty to preserve arose and that the information cannot be restored or replaced through additional discovery, the court's next inquiry is whether the loss of the ESI has caused prejudice or whether the party in possession acted "with the intent to deprive another party of the information's use in the litigation." Id. at *6 (quoting Fed. R. Civ. P. 37(e)(1-2)).  That finding governs the types of sanctions available for spoliation of ESI.

Upon a finding of prejudice, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).  Such measures may include "prohibiting the party that failed to preserve from putting on certain evidence, permitting the parties to present evidence or argument to the jury regarding the loss of ESI or giving the jury instructions to assist in the evaluation of such evidence or argument." Wai Feng Trading Co. Ltd., 2019 WL 118412, at *6 (citing Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e)).

Upon a finding of intent to deprive another party of the information's use in the litigation, the court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).  If such intent is shown, there is no need separately to establish prejudice.  Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e).

"The intent requirement in Fed. R. Civ. P. 37(e)(2) is 'stringent' – it must be based on more than just negligence or even gross negligence in producing or preserving ESI." Wai Feng

Trading Co. Ltd., 2019 WL 118412, at *7 (citation omitted). "Thus a court cannot conclude that the mere failure to retain ESI establishes that a party is guilty of acting with intent to deprive the other party of relevant information." Id. Nevertheless, intent may be inferred. Id.

The Secretary, as the moving party, bears the burden of proving the threshold requirements that relevant evidence has been lost and cannot be replaced, that it should have been preserved, and that it was not preserved because the Defendants failed to take reasonable steps to preserve it. Postle v. SilkRoad Tech., Inc., No. 18-cv-224-JL, 2019 WL 692944, at *1 (D.N.H. Feb. 19, 2019). It is also the Secretary's burden to prove that the Defendants acted with the intent to deprive him of use of the ESI in this litigation. Id. "The rule does not," however, "place a burden of proving or disproving prejudice on one party or the other." Adv. Comm. Note to 2015 Amendments, Fed. R. Civ. P. 37(e).

The quantum of evidence by which the Secretary must prove intent is unresolved. Postle, 2019 WL 692944, at *2. It is not apparent, and the parties have not cited any cases, that show that the First Circuit has addressed this issue. The First Circuit has applied a clear and convincing standard to discovery misconduct resulting in severe sanctions. Id. Therefore, this Court agrees with those courts that have found that intent must be shown by clear and convincing evidence.

      B.      The Secretary Has Not Established That Any ESI Was Lost That Cannot Be Restored Or Replaced Through Additional Discovery

The Secretary argues that there must be relevant text messages between Pirez and Seoane other than the May 8, 2017 text message described above. See Docket No. 93 at 10-12. The Defendants have presented a narrative whereby Pirez provided Seoane with an image of Paz's work documents after Seoane's initial CJIS search and before his final search. See Docket No. 88 at 9. However, according to the Secretary, CJIS records show that all of Seoane's Paz-related

9

searches took place in the span of 41 minutes on April 10, 2017. Docket No. 93 at 11. Both Pirez and Seoane told OSHA investigators that Pirez provided copies of Paz's work documents in person. Docket No. 93-1 at 6; Docket No. 97-5 at 28. The Secretary maintains that, given Seoane's statements to investigators, it appears more likely that the documents were sent to him via text message. Specifically, the Secretary argues that for Seoane and Pirez to have exchanged the documents in person after Seoane's original search of Paz's information, Pirez and Seoane would have had to meet in person within a period of 41 minutes, even though they were on the phone together for eight minutes in the middle of that block of time. Docket No. 93 at 12. The Secretary also points out that phone records show no phone calls between Pirez and Seoane between Paz's injury and Seoane's first CJIS search. He argues that must mean that Pirez and Seoane's first communication about Paz must have happened by text.

      The Secretary's arguments are speculative. The Secretary has failed to establish that any such text messages actually existed. During its questioning of Pirez, OSHA never established that Pirez communicated with Seoane concerning Paz via text. In response to a question specifically about text messages with Seoane regarding Paz, Pirez answered that he didn't "have any messages on my phone. I can't tell you." Docket No. 93-1 at 6. OSHA did not seek clarification on whether Pirez had no text messages on his phone with Seoane regarding Paz or whether he had no text messages on his phone at all. Indeed, Pirez testified that he does not know how to text "that good," and that he does not regularly communicate via text message or email. See Docket No. 93-1 at 6, 16.

      In addition, Pirez testified that he provided copies of documents to Seoane in person. Docket No. 93-1 6. Seoane corroborated that testimony. Docket No. 97-5 at 28. The Secretary also subpoenaed Seoane for, among other things, texts with Pirez about Paz. Docket No. 93 at 8,

10

n. 10.  Seoane responded that he had no responsive material.  Docket No. 93 at 9, n. 12.

Even if any such text messages existed, the Secretary has failed to establish that such messages were lost.  OSHA did not ask Pirez whether he had deleted any text messages with Seoane regarding Paz, but rather asked him "Would you have deleted messages like that?" to which Pirez stated only that "I get 100 phone calls a day" and that "I delete messages every week, every day."  Docket No. 93-1 at 6.  OSHA again failed to clarify what Pirez meant by that statement.

The Secretary makes much of the fact that Pirez replaced his cell phone two days before his OSHA interview and after receiving both OSHA's preservation notice and a subpoena for all texts between March 29 and May 15, 2017 with law enforcement personnel.  See Docket No. 93 at 5-6.  The Secretary, however, has not established that the change of phone itself affected the availability of relevant text messages.  Other than asking whether the phone had the same phone number and same carrier, OSHA did not ask any follow up questions about the cell phone change or take other steps.  In addition, in sworn answers to interrogatories, the Defendants have stated that to the best of their understanding, all data that had been on Pirez's old phone was available on his new phone.  Docket No. 93-9 at 14.

      C.      The Secretary Has Not Shown That Lost Information Is Unavailable In Any Other Location

The Secretary has only established that Pirez lost the May 8, 2017 text message.  However, the Secretary has obtained a copy of the text message from Seoane.  Accordingly, he cannot establish that the information is unavailable in any other location.

      D.      The Secretary Has Not Shown That The Defendants Failed To Take "Reasonable Steps" To Preserve Relevant Text Messages

Even assuming that additional text messages existed and they were lost, the Secretary has

11

presented no evidence to show that the Defendants failed to take reasonable steps to preserve any such messages. Indeed, it is not evident that the Secretary has even sought such information. For example, in its interview of Pirez, OSHA failed to ask any questions regarding what, if anything, he had done to preserve any text messages between May 22, 2017 (the date of the preservation notice) and the June 28, 2017 (the date of the interview). See, e.g., Hardy v. UPS Ground Freight, Inc., No. 3:17-cv-30162-MGM, 2019 WL 3290346, at *5 (D. Mass. Jul. 22, 2019) (finding that defendant had not met its burden of demonstrating spoliation of text messages because it never asked plaintiff how, when, or why he lost the text messages). The Secretary, therefore, has failed to meet its burden to show that the Defendants failed to take reasonable steps to preserve relevant evidence.

      E.      The Secretary Has Failed To Prove Intent

Finally, there is no evidence that Pirez acted with the intent to destroy any text messages. The Secretary argues that "Pirez's intent to deprive is evident from the face of two documents—the transcript of his OSHA interview and the screenshot of the 5/8/2017 text exchange obtained from Seoane." Docket No. 93 at 17. According to the Secretary, the May 8, 2017 message contradicts Pirez's statements that he had no idea how law enforcement knew where he would be when Paz was arrested. See id. From that, he argues that the Court must infer an intent to deprive OSHA and the Secretary from obtaining evidence of the May 8, 2017 text message. See id. at 17-18.

First, it is not entirely clear that the message is harmful to the Defendants. The Defendants have admitted that Pirez provided information to law enforcement about Paz's expected visit to Tara's office on the day of his arrest. See Docket No. 88 at 11-13. In any event, the fact remains that the Secretary has a copy of the May 8, 2017 text message. The text

being available, it would be inappropriate to instruct the jury that it must infer that the text contained information unfavorable to the Defendants. The jury can see the May 8, 2017 text message and the Secretary remains free to argue his case to the jury based on Pirez's OSHA interview and the contents of the May 8 text message.

Accordingly, I find that, at this stage, the Secretary has failed to establish that spoliation sanctions are warranted in this case.

III. <u>ORDER</u>

For the foregoing reasons, I deny the motion without prejudice.

/s/ Jennifer C. Boal  
JENNIFER C. BOAL  
U.S. MAGISTRATE JUDGE